*Forest Grove Citizens Association, et al. v. Forest Glen Medical Center, LLP, et al.*
No. 2475, Sept. Term, 2024
Opinion by Leahy, J.

**Administrative Law > Judicial Review > Standard of Review**
Where, as here, a party claims that an administrative agency's decision is void as a matter of law, we review whether the circuit court was "legally correct" in *its* determination. *See Halici v. City of Gaithersburg*, 180 Md. App. 238, 249 (2008) (explaining that "a challenge to the statutory authority of the administrative body to take the action at issue" is a "purely legal issue" that may be considered by the reviewing court "at any time, even if it were not raised before the agency"). Because the resolution of this issue requires statutory interpretation, which is a question of law, we review the circuit court's decision *de novo*. *M-NCPPC v. Anderson*, 395 Md. 172, 181 (2006).

**Zoning and Planning > Regional District Act > Montgomery County Code > "Applicant"**
Section 50-2.2(A) of the Montgomery County Code defines an applicant as an "individual, partnership, corporation, or other legal entity and its agent that undertakes the subdivision of land[,]" including "all persons involved in successive stages of the project, even though such persons may change and ownership of the land may change." MCC § 50-2.2(A). This provision expressly contemplates that the entities involved in a project may shift over time—and even ownership of the land itself may change—without undermining the validity of the application.

**Principal and Agent > Creation and Existence of Agency Relationship**
Above all, the record in this case established that at the time of the Planning Board Hearing, JLB Realty maintained the actual authority to pursue—and otherwise act in furtherance of—the Plans as the developer and agent of Forest Glen Medical Center LLP ("FGMC"), the property owner. An actual agency-principal relationship may be established "by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's account." *Citizens Bank of Md. v. Md. Indus. Finishing Co. Inc.*, 338 Md. 448, 459 (1995) (quoting Restatement (Second) of Agency § 26) (internal quotation marks omitted). The purchase contract and its expiration date do not determine the issue. What is most relevant are the written words contained in FGMC's authorization letter to JLB Realty and the subsequent conduct of the principal, here FGMC.

**Zoning and Planning > Regional District Act > Sector Plan**
To the extent the Montgomery County Code has "elevated" the 2020 Forest Glen/Montgomery Hills Sector Plan Sector Plan by requiring the Planning Board demand substantial conformance to master plan (or sector plan) recommendations, *see Greater Baden-Aquasco*, 412 Md. at 100-01, we observe that substantial conformance is not the same as strict conformance. We have explained that even when a sector plan is binding on

the Planning Board in terms of what the Board "must find," the Sector Plan's specific "recommendations" may remain "aspirational rather than mandatory." *Pringle v. Montgomery Cnty. Plan. Bd. M-NCPPC*, 212 Md. App. 478, 489 (2013). To hold otherwise would require us to read "recommendations" as "requirements," and equate "substantial conformance" with mere "conformance," running contrary to our canons of statutory interpretation. *See Koste v. Town of Oxford*, 431 Md. 14, 25-26 (2013).

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2475

September Term, 2024

_____

FOREST GROVE CITIZENS ASSOCIATION,
ET AL.

v.

FOREST GLEN MEDICAL CENTER, LLP,
ET AL.

_____

Leahy,
Reed,
McDonald, Robert N.
         (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: May 29, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

* Judge Rosalyn Tang did not participate in the decision to report this opinion pursuant to Md. Rule 8-605.1.

As our Supreme Court once observed, "Montgomery County is somewhat unique in the source and exercise of its municipal authority to regulate the use of land." *Remes v. Montgomery Cnty.*, 387 Md. 52, 70 (2005). Most chartered counties in Maryland derive their zoning and planning authority from the Express Powers Act, now codified at Maryland Code (2013), Local Government Article ("LG"), §§ 10-101-330. However, Montgomery County's zoning power originates in the Regional District Act, a statute that "divides broadly authority related to zoning, planning, and other land use matters between the [Prince George's and Montgomery] county (district) councils, the Maryland-National Capital Park & Planning Commission [("M-NCPPC")], and the county planning boards." *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 525-26 (2015); *see also Pan American Health Organ. v. Montgomery Cnty.,* 338 Md. 214, 217-18 (1995); *Council of Chevy Chase View v. Rothman*, 323 Md. 674, 685 (1991); *Northampton Corp. v. Prince George's Cnty.,* 273 Md. 93, 96 (1974). Overall, subject to exceptions not relevant here, "Montgomery County's zoning authority arises from the Regional District Act, and is regulated by the provisions of the Montgomery County Code." *Remes*, 387 Md. at 71.

In this appeal, three different but interrelated chapters of the Montgomery County Code ("County Code" or "MCC") govern our analysis: Chapter 22(A) ("Forest Conservation Law"), Chapter 50 ("Subdivision Regulations"), and Chapter 59 ("Zoning

Ordinance").[1]  Respectively, these chapters prescribe the requirements for a preliminary plan, a "drawing for a proposed subdivision submitted for approval before the preparation of a plat[,]" MCC § 50-2.2; a site plan, a "detailed overview of the applicant's development[,]" MCC § 59-7.3.4(A)(4) (2014); and a forest conservation plan, MCC § 22(A)-11(b)(2)(A).

Forest Grove Citizens Association, Nandini Arunkumar, Pamela Stanziani, and Friends of Sligo Creek (collectively, "Appellants") filed the underlying petitions for judicial review in the Circuit Court for Montgomery County.  Appellants challenged a set of resolutions ("Resolutions") by the Montgomery County Planning Board of the M-NCPPC (the "Planning Board" or "Board"), appellee, approving a preliminary plan, site plan, and forest conservation plan (collectively, "Plans").  These Plans, submitted by developer JLB Realty LLC ("JLB Realty"), involve the proposed redevelopment of a 3.78-acre property on Georgia Avenue facing the Forest Glen Metro Station (the "Property") owned by co-appellee Forest Glen Medical Center, LLP ("FGMC").  After a hearing,  the circuit court affirmed the resolutions, and this appeal timely followed.

Appellants present three questions for our review, which we rephrase as follows:[2]

---

[1]    The County Code is available online at https://codelibrary.amlegal.com/codes/montgomerycounty/latest/overview.

[2] The Appellants' questions presented in their brief are:

   1. Did the Planning Board err when it approved JLB Realty's Preliminary Plan, Site Plan, and Forest Conservation plan, even after JLB

(Continued)

I.  Are the Resolutions void as a matter of law because the purchase contract between JLB Realty and FGMC expired prior to their issuance by the Planning Board?

II.  Is there substantial evidence in the record to support the Planning Board's determination that the preliminary plan and the site plan substantially conform to the 2020 Forest Glen/Montgomery Hills Sector Plan?

III.  Is there substantial evidence in the record to support the Planning Board's grant of the tree variance request associated with the forest conservation plan?

For the reasons that follow, we affirm.

## BACKGROUND

### *The Property*

The facts of this appeal are generally not in dispute. The Property is located in the northeast quadrant of Georgia Avenue and Forest Glen Road in Silver Spring, Maryland, directly across from the Forest Glen Metrorail Station. It is zoned CRT-2.5, C-2.5, R-2.5, H-120'[3] under the Montgomery County Zoning Ordinance ("Zoning Ordinance"), codified

---

Realty no longer held any interest in the Subject Property or the associated development application?

2. Did the Planning Board err as a matter of law by finding that the Preliminary Plan and Site Plan substantially conform with the applicable Master Plan?

3. Did the Planning Board violate Maryland's Forest Conservation Law by approving JLB Realty's request for a variance to remove eight Protected Tress and disturb the area within the critical root zone of one Protected Tree as part of the Forest Conservation Plan?

[3] The number immediately following the "CRT" classification represents the maximum total floor area ratio ("FAR") for the site; the numbers following the "C" and "R" represent the maximum non-residential and residential FAR, respectively; and the

(Continued)

3

at Chapter 59 of the County Code. Under the Zoning Ordinance, a CRT zone—which stands for a Commercial Residential Town zone—is "intended for small downtown, mixed-use, pedestrian-oriented centers and edges of larger, more intense downtowns[,]" MCC § 59-4.5.1(C), and is designed to, among other things, "implement the recommendations of applicable master plans[.]"[4] MCC § 59-4.5.1(A).

The governing master plan for the Property is the 2020 Forest Glen/Montgomery Hills Sector Plan (the "Sector Plan"), which, in turn, represents "a comprehensive amendment to portions of the approved and adopted 1989 Master Plan for the Communities of Kensington-Wheaton[.]" According to its own abstract, the Sector Plan "provide[s] comprehensive recommendations for the use of public and private lands," which "should be referred to by public officials and private individuals when making land use decisions[.]"

The Property is described in the Sector Plan as follows:[5]

Constructed in 1967, the existing medical office building and associated

---

number following the "H" refers to the maximum building height in feet. *See* MCC § 59-2.1.3(D)(2); *see also* MCC § 59-4.5.2(A)(2).

[4] The County Code provides that a "plan" means "the General Plan, an area master plan, a sector plan, the Master Plan of Highways, a functional plan, and any amendments to those plans," MCC § 33A-2, but it does not specifically define "sector plan." We recently observed, however, that such plans are "widely used in both Montgomery and Prince George's Counties" and described them as "detailed plans for the development of a portion of one or more master planning areas[.]" *Heard v. Cnty. Council of Prince George's Cnty.*, 256 Md. App. 586, 610 n.15 (2022).

[5] The Sector Plan describes the Property as "as a special exception in [an] R-60 zone," and recommends its rezoning to CRT-2.5, C-2.5, R-2.5, H-120'. The Property had already been rezoned as recommended prior to the approval of the Plans.

parking lot are situated on roughly 3.9 acres across multiple lots. . . . [T]he building is nearing the end of its useful life and continuing maintenance and upgrades may begin to exceed the cost of new development. On the site, a roughly 1.25-acre vegetated area currently serves as a buffer between the office building and adjacent residences.

The Sector Plan further outlines specific recommendations for the Property. Among other things, for the Property's land use and zoning, the Sector Plan recommends "[p]rioritiz[ing] affordable housing and habitat preservation and restoration as the top public benefit for optional method development." Specifically, the Sector Plan notes:

> Any optional method project that includes residential dwelling units should provide a minimum of 15 percent [Moderately Priced Dwelling Units (MPDU)]. In addition, with redevelopment, **a minimum of 25 percent of the units should be two-bedroom units and five percent of the units should be three-bedroom units.** Additionally, given the substantial investment by the County in the Metro access tunnel construction, **the Plan recommends 10 percent of the units also be provided as affordable to households earning at or below 100 percent of Area Median Income (AMI).**

(Emphasis added). Regarding the 1.25-acre vegetated area, which is "dominated by native black locust trees[,]" the Sector Plan offers the following environmental recommendation:

> **[w]ith respect to the remnant forest, at the time of redevelopment, maximum flexibility on the site should be given for providing an area of equal environmental benefit that also provides for improved community benefit and access.** Equal environmental benefits may include improved water and air quality, strategies that provide for reduced greenhouse gas emissions and increased biodiversity and habitat protections, including improved tree canopy. Development should also, as a part of its open space requirement, preserve healthy indigenous trees and replant stratified vegetation where possible.

(Emphasis added). Additionally, the Sector Plan outlines various recommendations for the Property's urban design and park access. Relevant to the Plans at issue in this appeal, Section 7.3.4.(E)(2)(g) of the Zoning Ordinance and Section 50.4.2.(D)(2) of the

5

Subdivision Regulations require the Planning Board to find that a site plan application and a preliminary plan application "substantially conform" with the recommendations of the applicable master plan for approval.

*FGMC and JLB Realty sign Contract to Purchase Property*

FGMC has owned the Property Since 2003. On November 11, 2021, JLB Realty entered into an agreement with the FGMC to purchase the Property.[6] Subsequently, on August 23, 2022, Harold Landis, the managing partner for FGMC, signed the following letter:

> Forest Glen Medical Center LLP is the Owner of the [Property].
>
> *   *   *
>
> **This letter hereby affirms that <u>J. Graham Brock</u> at <u>JLB Realty LLC</u>, the Contract Purchaser of the [Property], is authorized to sign for, file, and pursue any and all applications and documents and permits on behalf of Forest Glen Medical Center LLP, in connection with JLB Realty redevelopment at the [Property];** including but not limited to Maryland-National Capital Park and Planning Commission and other applicable government agencies that may be required in connection with pursuing land use entitlements for the proposed project on the [Property]. **Such applications and documents may include, but are not necessarily limited to**, **those associated with . . . Forest Conservation Plan and other related requirements, . . . Sketch Plan review, Preliminary Plan of Subdivision review, and Site Plan review (collectively, the "Applications").**
>
> *   *   *
>
> **JLB Realty LLC, by and through its authorized representatives and its affiliated entities, is specifically authorized to (i) execute all necessary application forms and documents, (ii) obtain plans and drawings, and (iii) act on behalf of Forest Glen Medical center LLP in furtherance of such Applications.**

(Emphasis added).

---

[6] This agreement between JLB Realty and FGMC is not in the record.

***The Planning Board Approves JLB Realty's Sketch Plan***[7]

In November 2022, JLB Realty, as contract purchaser, submitted sketch plan No. 320230020 ("Sketch Plan") for the Property to the Planning Board for approval, after having a pre-submittal meeting with the community members in September 2022. In the Sketch Plan, JLB Realty proposed replacing the existing medical office building with a mixed-use building, a civic green space, stratified vegetation, and accommodation for the tunnel access to Forest Glen Metro Station.

On March 20, 2023, the Planning Board staff members ("Planning Staff" or "Staff") issued a report, recommending approval of the Sketch Plan subject to certain conditions. In relevant part, Planning Staff listed issues that JLB Realty, as applicant, needed to address for the preliminary and site plans, including:

- "The Applicant must submit and receive approval of a Preliminary/Final Forest Conservation Plan."
- "Plantings should use a variety of native plants that provide habitat and food sources for wildlife."
- "The Applicant should revisit the unit mix provided with the development in order to meet the Sector Plan recommendation . . . for 3-bedroom units."

On March 30, 2023, following a public hearing, the Planning Board voted 4-0—with one member abstaining—to approve the Sketch Plan subject to certain enumerated

---

[7] According to the Zoning Ordinance, a "sketch plan" is a developer's preliminary development plan, which "describes a project at an early stage to provide the public and the Planning Board the chance to review the proposed development for general design, density, circulation, public benefits, and relationship to the master plan before a developer is required to expend significant resources on design and engineering." MCC § 59-7.3.3(A)(2). A party filing a sketch plan "must own the subject property or be authorized by the owner to file the application." MCC § 59-7.3.3(B)(1). To be approved by the Planning Board, the sketch plan must also "substantially conform with the recommendations of the applicable master plan[.]" MCC § 59-7.3.3(E)(2).

conditions. In a written resolution, consistent with Staff's comments, the Planning Board noted that JLB Realty needed to address issues regarding the Forest Conservation Plan, native plantings, and the unit mix when filing preliminary and site plans. Still, the Planning Board concluded that the Sketch Plan "substantially conform[ed] to the recommendations of the Sector Plan." In a footnote, the Planning Board also clarified that "the term 'Applicant' shall . . . mean the developer, the owner or any successor(s) in interest to the terms of this approval" for the purpose of its resolution.

### *First Petition for Judicial Review*

Forest Grove Citizens Association, Nandini Arunkumar, and Pamela Stanziani (collectively, "Forest Grove Petitioners") filed a petition for judicial review in the Circuit Court for Montgomery County from the Planning Board's Resolution approving the Sketch Plan. They claimed, among other things, that the signage notifying the September pre-submittal meeting "was not in conformance with" the County Code requirements. JLB Realty countered that its signage "substantially complied with necessary standards[,]" arguing that both the sign's content and the high attendance at the pre-submitting meeting established that the notice was "fundamentally fair[.]"

On November 16, 2023, the circuit court issued a written order,[8] which remanded the case to the Planning Board "for further proceedings, without affirming, reversing, modifying [its] action" and instructed that

> on remand, the [] Planning Board shall consider and decide, based on the record and without further factfinding, whether (1) substantial compliance

---

[8] Although the order indicates that the circuit court also announced its oral ruling on November 14, 2023, no transcript from that hearing is available in the record.

with pre-submittal meeting signage can satisfy applicable notice requirements, and (2) if substantial compliance can be sufficient, whether [JLB Realty's] notice signs substantially complied with the applicable notice requirements[.]

On remand, the Planning Board, by 5-0 vote, concluded that: (1) that substantial compliance with pre-submittal meeting signage satisfies notice requirements under applicable Maryland law; and (2) the pre-submittal meeting sign at issue "substantially satisfied" all relevant statutory and regulatory requirements. The Planning Board further noted, "[a]ny variations were de minimis." Thereafter, in January 2024, JLB Realty filed a motion with the circuit court to affirm the Planning Board's approval of the Sketch Plan.

### *The Plans*

While the judicial review of the Sketch Plan was pending before the circuit court, JLB Realty filed three separate applications on August 23, 2023, for approval of preliminary plan No. 120230160 (the "Preliminary Plan"), site plan No. 820230130 (the "Site Plan"), and forest conservation plan No. F.20240040 (the "Forest Conservation Plan"), respectively. As described by the Planning Board, the Preliminary Plan proposed consolidating six existing lots on the Property into a single 3.78-acre lot to accommodate 5,000 square feet of commercial area and 420,000 square feet of residential development. The Preliminary Plan also anticipated the creation of a separate parcel to be conveyed to the Montgomery County Department of Transportation ("MCDOT") for a new entrance to Forest Glen Metrorail Station. Consistent with the Preliminary Plan, the Site Plan presented a mixed-use building that would include "420,000 square feet of residential uses[] for up to 390 multi-family dwelling units," 15% of which would be MPDUs, and

9

"5,000 square feet of retail non-residential uses." The public and private open spaces proposed as part of the Site Plan included a through-block connection at the north of the property, a civic green and urban plaza at the south of the Property, and streetscape improvements along Georgia Avenue, Forest Glen Road, and Woodland Drive.

Additionally, the Forest Conservation Plan provided for "0.43 acres of forest clearing" and included a "request for a tree variance for impacts to subject trees." JLB Realty sought a variance under MCC § 22A-21 to remove eight specimen trees that measured 30 inches or greater "in diameter-at-breast-height (dbh)."

*Agency and Staff Review*

Planning Staff and multiple governmental agencies, including MCDOT, Maryland State Highway Administration ("SHA"), and Montgomery County Department of Housing and Community Affairs ("DHCA"), reviewed the Plans. On February 8, 2024, the DHCA sent an approval letter to Parker Smith, a Planning Staff member, recommending approval "subject to the condition that [JLB Realty] modify their floorplans to comply with the bedroom count percentages as recommended" in the Sector Plan. The letter stated:

> The development referenced above is within a CRT Zone (CRT-2.5, C-2.5, R-2.5, H-120). **Section 4.5.1.A.(1) of Chapter 59 states that the intent of CRT zones is to implement the recommendation of applicable master plans.**
>
> * * *
>
> Although the development is meeting the requirements of Chapter 25A by providing 15 percent MPDUs, **they are not substantially meeting the recommendations of the Forest Glen Montgomery Hills Sector Plan, and therefore of the zoning requirements, by either providing 10 percent of the units at 100 percent AMI and/or providing 25 percent of the units as 2-bedroom units and 5 percent of the units as 3-bedroom units[.]**

10

> **To substantially comply with the Master Plan recommendations, DHCA requests that the applicant provide 5 percent 3-bedroom units at the time of the Agreement to Build.** As currently shown on their plans, 25 percent of the units should remain two-bedroom units to also comply with the Master Plan.

(Emphasis added).

Planning Staff subsequently issued an 83-page report (the "Staff Report"), containing its recommendations and proposed conditions for approval of the Plans. The Staff Report contained exhaustive descriptions of the Property and the Plans, supplemented by photos, maps, and computer-generated graphics. It further incorporated data from a school adequacy test and transportation impact study to confirm the Plans' compliance with the relevant standards and requirements. Additionally, Staff detailed JLB Realty's community outreach efforts, attaching letters from community members, pre-submission meeting minutes, and supporting affidavits. Based on the record, Staff concluded that the Plans "substantially conform with" the Sector Plan's recommendations and meet "all requirements of the Subdivision Regulations, Zoning Code, and Forest Conservation Law."

In support of its conclusions, Staff detailed the Plans' compliance with each individual Sector Plan recommendation. On the issue of affordable housing, Staff noted that, consistent with the DHCA's February 8, 2024 approval letter, JLB Realty would "provide a minimum of 15 percent [MPDUs], a minimum of 25 percent of the units as two-bedroom units, and a minimum of 5 percent of the units as three-bedroom units." Staff observed that "[p]rojects are awarded 12 Public Benefit points for every 1 percent of MPDUs provided greater than 12.5 percent[,]" and therefore the Site Plan, with 15% MPDUs, "qualifie[d] for 30 Public Benefit points in the [MPDU] category."

11

As for the environmental recommendation, Staff observed that the Property contains 0.2 acres of tree cover and 0.43 acres of forest, according to the Natural Resources Inventory/Forest Stand Delineation ("NRI/FSD"). Staff noted that "[t]he Property has many constraints and requirements shaping the design of the proposed development[,]" including: "an existing sewer line running through the center of the Property that must be relocated"; "the storm drain line and stormwater management handling runoff from Georgia Avenue"; the tunnel connecting to the Forest Glen Metro Station"; and the "Sector Plan requirement of providing a minimum of one-half acre of civic green[.]" Staff noted that JLB Realty proposes clearing the existing vegetated area to accommodate a relocated sewer line. Staff found that, "even though small patches of forest are valuable for the wildlife habitat and many environmental benefits," the existing forest was not a "healthy, regenerative ecosystem" due to heavy infestation by non-native plants. Staff further noted that JLB would provide 0.46 acres of stratified plantings to mitigate the environmental impact, explaining:

> These planting areas include native trees, shrubs, perennials, grasses, and groundcover that provide a mix of habitat and food sources. Special attention was paid to the needs of the members of the Lepidoptera order (butterflies and moths), which is an important group due to their roles as pollinators and food source for many other animals. For example, Willow Oak (*Quercus phellos*) is one of the canopy trees and it provides acorns that are an important food source for small mammals, as well as serving as a host plant for Lepidoptera species. Mapleleaf Virburnum (*Viburnum acerifolium*) produces fruit for wildlife and the flowers provide support for pollinators, as well as hosting the larvae for many species of Lepidoptera.

Accordingly, Staff concluded that the Plans offer a "healthy alternative ecosystem to the existing remnant forest and tree cover[.]"

12

In addressing JLB Realty's tree variance request as part of the Forest Conservation Plan, Staff concluded that denying the variance would result in an "unwarranted hardship" by denying JLB Realty "reasonable and significant use" of the Property. Staff also evaluated the Plans' impact on each specimen tree, concluding that JLB Realty's development would result in "the removal of eight (8) Protected Trees and impacts to . . . one (1) Protected Tree[.]" After identifying each tree's species, location, and size, Staff noted:

> Trees ST-3, ST-7, ST-8, and ST-11 are located in the forest and vegetated area in the northern portion of the Property. The Sector Plan granted maximum flexibility for the removal and mitigation of the forest and vegetated area. This area will be impacted by the relocated sewer line and site grading, requiring the removal of these Protected Trees.
>
> Tree ST-13 is located adjacent to the existing entrance from Forest Glen Road and will be impacted by the removal of the pavement. Redevelopment of the Property requires the removal of the entrance from Forest Glen Road and regrading of the Property to meet the open space requirements of the Sector Plan. It is also adjacent to the new entrance to the Forest Glen Metro Station, requiring the removal of this Protected Tree.
>
> Trees ST-15, ST-16, and ST-17 are located within the Woodland Drive right-of-way. Required frontage improvements along Woodland Drive, including adding on-street parking and upgraded pedestrian facilities, require removing these Protected Trees.
>
> Tree OST-1 is an off-site tree located in the Sherwood Road right-of-way that will be impacted by utility construction in the paved area of Woodland Drive. This tree will be retained with minor impacts.[9]

---

[9] Staff also recommended to the Planning Board that, in order for Applicant to meet the requirements of the applicable Forest Conservation law,

> 1.11 acres of forest mitigation credits must be purchased through a forest conservation bank located in the Sligo Creek watershed or other Priority Area. If no credits are available in a forest conservation bank located in the

(Continued)

13

The report concluded with the findings required for granting a tree variance.  First, Staff found, granting the variance would "not confer on the Applicant a special privilege" because the variance concerned "site-specific recommendations in the Sector Plan . . . that would be applicable to any redevelopment of the Property."  Second, the need for the variance was "not based on conditions or circumstances which are the result of the actions by the [A]pplicant," but was instead "based on existing site conditions and the requirements to meet development standards, Sector Plan goals . . . and County Code requirements." Third, the requested variance was "not based on a condition related to land or building use . . . on a neighboring property[,]" but instead was "a result of the existing conditions and the required improvements on the Property[.]"  Finally, granting the variance would not "violate State water quality standards or cause measurable degradation" because the subject trees were  not located within a "stream buffer, wetland, or a special protection area."

### *Board Hearing on the Plans*

On March 7, 2024, the Planning Board held a public hearing ("Board Hearing") on the Plans.  The Board Hearing began with a PowerPoint presentation by Parker Smith and Amy Lindsey, Planning Staff members who provided an overview of the Property and the

---

Sligo Creek watershed or other Priority Area, the Applicant must purchase 1.32 acres of forest mitigation credits through a forest conservation bank located elsewhere in the County.  If no forest mitigation credits are available for purchase at any forest conservation banks in the County, the Applicant may make a fee-in-lieu payment to satisfy the 1.32 acres of reforestation required.

14

proposed development. During the presentation, they addressed the community's concerns about the development, which included: (1) the creation of a new "access point" on Woodland Drive; (2) the amount of parking; (3) the development's scale, design, and compatibility; and (4) the loss of existing forest.

Smith explained that a traffic study approved by Staff, MCDOT, and SHA confirmed the necessity of the Woodland Drive access point. In response to the concerns that the proposed development would worsen the traffic congestion at the Forest Glen Road and Georgia Avenue intersection, he explained that JLB Realty would be "required to signalize the intersection of Tilton Drive and Georgia Avenue[,]" thus providing an alternative route for drivers. On the issue of parking, Smith highlighted that the Plans proposed 466 parking spaces, which marks "a decrease of 74 spaces" from the Sketch Plan, and would require residents to pay an additional parking fee as a "concrete financial incentive . . . to limit car possession and use." He also testified that concerns about the development's scale, design, and compatibility had been "addressed through extensive coordination and design review[.]"

Addressing environmental concerns, Lindsey acknowledged that the Plans "propose[] to remove all 0.43 acres of forest" on the Property, while providing, among other things, "0.46 acres of stratified plantings" in mitigation. Nonetheless, Lindsey presented multiple photographs showing the degraded state of the existing vegetation on the Property, explaining that much of the visible greenery was caused by Evergreen Euonymus, an "invasive species that has covered many of the trees[.]" Following this

15

presentation, Staff members affirmed that the Plans substantially conformed to the recommendations of the Sector Plan.

The Planning Board also heard testimony from community members, many of whom voiced their opposition to the Plans. Pamela Stanziani testified on behalf of the Forest Grove Citizens Association, which she described as a "community whose members, residents, are directly impacted by this development," and expressed concerns with the "proposed mass increase of cars traveling throughout [her] neighborhood" and with the "lack of notifications to . . . association residents" throughout the development process. She also emphasized the importance of "maintain[ing] a community as opposed to development for tax dollars and what is clearly not going to be significant affordable housing."

Nandini Arunkumar similarly raised general objections to the development process, stating that there had been "no forum for the neighborhood and the community who [would] be impacted by such a large development[.]" She also submitted a written letter to the Planning Board as the Secretary of the Forest Grove Citizens Association listing the community's "concerns with the lack of conformance of this development to the Sector Plan," including "[c]lear cutting and removal" of all trees, and the developer's "[r]efusal to comply with affordable housing targets set forth in the Sketch Plan[.]"

Kit Gage, who identified herself as the "advocacy director" for Appellant Friends of Sligo Creek, opposed the removal of the forest in the Property. Though acknowledging that the forest "ha[d] seen better days[,]" Gage maintained that the forest "could be made healthy with some serious effort" and was in fact "still functional . . . in many ways[,]"

16

emphasizing that it had "some big and substantially healthy trees" and "the dead or dying trees [that] are home to woodpeckers . . . and worms and bugs that baby birds require to live."

Galen Rende, who also testified on behalf of Appellant Friends of Sligo Creek, claimed that the Preliminary Plan and Site Plan did not "substantially conform" to the Sector Plan's environmental recommendations. According to Rende, although the Sector Plan prioritizes "preserving and restoring the existing forest cover, rather than removing and replacing it[,]" the Staff Report showed no meaningful consideration of "any alternatives to the proposed development that might keep the existing forest intact." Rende also noted a discrepancy between the 1.25 acreage of the forest in the Sector Plan and the 0.43 acreage reported in the Staff Report, arguing that there was "no explanation . . . as to why this value is so different[.]" Finally, Rende challenged JLB Realty's variance request under the Forest Conservation Plan, claiming that neither JLB Realty nor the Planning Staff adequately explained how the Property's conditions justify the variance and removal of trees.

Near the end of the hearing, Amy Lindsey responded to the community's concerns with the Plans' environmental impacts. As to the discrepancy between the forest acreages cited in the Sector Plan and in the Staff Report, Lindsey explained that environmental conditions on a property may change after a master plan is published, and it is not until a development application is reviewed that the actual forest acreage is determined. She expounded, "when we're making Sector Plan recommendations and writing descriptions, we're not going out and doing all of the detailed field work required to make those

determinations." According to Lindsey, the Forest Conservation Plan offers a more precise measurement based on NRI/FSD "by looking at not only the number of stems and trees that are in the area, but also how deep the area is and what the acreage of the area is."

Lindsey also noted that the size and location of the Property made it difficult to meet the Sector Plan's recommendations without removing the existing forest. She explained:

> **It's often very difficult in an infill situation to preserve forest because we're dealing with a lot of utilities that either have to be relocated.** You're dealing with drainage considerations so that we're not shedding water onto adjacent properties. You're dealing with an infill situation where you have to meet grading on all four sides at -- with usually not a lot of extra room, not a lot of extra flexibility.
>
> So, for example, this property is really not that large. It's under 4 acres, and we were -- it -- through the sector plan, asking for half an acre to a full acre of public open space. So there isn't a lot of flexibility always and a lot of space to move along. And when you include the three road frontages that all have improvements on them, their pedestrian facility improvements on all three of those frontages, that starts to add some levels of complication as well as the grading necessary on this property. So there is a fairly substantial grade. **So in this case, we do not have a scenario that shows the existing forest to be retained and still able to meet that -- the housing desire.**

(Emphasis added). Nonetheless, Lindsey emphasized that Staff and JLB Realty worked together to "take[] into account many of the ecosystem services that a forest actually provides." When the Planning Board asked if she followed procedures under the Forest Conservation Law, Lindsey answered, "[a]bsolutely."

J. Graham Brock also appeared on behalf of JLB Realty, along with JLB Realty's counsel. Regarding affordable housing, counsel confirmed that 15% of the housing would be affordable housing and 25% of those affordable units would be two-bedrooms, consistent with the Sector Plan's recommendations. Although the Plans also included

18

three-bedroom units, counsel acknowledged that they comprised only 2.5%, falling short of the Sector Plan's 5% recommendation. Brock attributed this shortfall to architectural and financial constraints, explaining that the physical configuration of the building—limited by setbacks along Woodland Drive and site constraints at the corner of Georgia Avenue—restricted the number of corners available for three-bedroom units, which are typically larger. Brock also noted that increasing the number of three-bedroom units would require combining smaller units, thereby reducing the overall unit count and impacting the development's financial feasibility.

On behalf of the DHCA, Maggie Gallagher addressed JLB Realty's failure to meet the 5% recommendation for three-bedroom units. She stated:

> **I just wanted to add that the Master Plan also recommended that they include additional affordable units at slightly higher AMI than the MPDUs. And we did talk to the applicant and decide that it would be okay to waive that piece of the Master Plan** since the market rate units would likely be set around that price anyways, with the condition that they show us that the market rate would be around that price.
>
> So that's why we kind of felt that kind of sticking with that 5 percent, three-bedroom units was reasonable since we were already waiving that second recommendation of the Master Plan.

(Emphasis added). The Planning Board then asked Gallagher whether "it's really important . . . to get the five percent, three bedrooms[,]" and she responded:

> I think the reason we are kind of stuck on the five percent is because it's one more, three bedroom. It's just one unit.
>
> \* \* \*
>
> So if they could dedicate one market rate three bedroom as an MPDU. The way we read the Master Plan is that it had to be 5 percent of the MPDUs. And we really only have, you know, a say over those MPDUs. So if they

19

could designate one more three bedroom as an MPDU opposed to adding additional three bedrooms to the site, we would be okay with that.

Counsel for JLB Realty stated that she thought DHCA was "requesting 5 percent of all of the units as three bedrooms, not of the MPDUs[,]" and "[i]f that's indeed the case, and it's 5 percent of the MPDUs and it's one more unit, that's fine."

### *The Planning Board Resolutions*

At the conclusion of the hearing, the Planning Board unanimously approved the Preliminary Plan, Site Plan, and Forest Conservation Plan with conditions and amendments, and subsequently entered written Resolutions. Resolutions once again clarified that "for the purpose of these conditions, the term **'Applicant' shall also mean the developer, the owner or any successor(s) in interest to the terms of th[e] approval**." (Emphasis added). The Resolutions further noted that the Planning Board, after considering Staff's recommendations "as presented at the hearing and/or as set forth in the Staff Report, . . . hereby adopts and incorporates [Staff Report] by reference[.]"

The Planning Board then determined that the Preliminary Plan and the Site Plan "substantially conform[ed] to" the Sector Plan, which "prioritizes affordable housing and habitat preservation and restoration as the top public benefits" for the Property. More specifically, regarding affordable housing, the Planning Board found:

> As conditioned by DHCA in its approval letter dated February 8, 2024, to achieve substantial conformance with the Sector Plan[,] the Applicant will provide a minimum of 15 percent Moderately Priced Dwelling Units (MPDUs), a minimum of 25 percent of the units as two-bedroom units, and a minimum of 5 percent of the units as three-bedroom units.

Turning to the Sector Plan's environmental recommendations, the Planning Board found:

20

According to the approved [NRI/FSD], approximately 0.43 acres of remnant forest exist on the Site. To achieve equivalent environmental benefit, the Applicant will plant stratified vegetation throughout the site, as well as micro-bioretention planters along the perimeter of the building, some of which will accommodate the stormwater needs associated with the [SHA's] Montgomery Hills/MD 97 project. In addition, the Applicant will construct two consolidated open spaces, on the northern and southern portions of the Site, with landscaped areas, terraces, and outdoor seating, both of which are accessible for the benefit of the surrounding community.

The Planning Board also found that the Forest Conservation plan and its associated variance "satisfie[d] all the applicable requirements of the Forest Conservation Law[.]" In support of this conclusion, the Board adopted the Staff Report's variance findings in their entirety, including the specific finding that the variance request is "based on existing site conditions and the requirements to meet development standards, Sector Plan goals, . . . and County Code requirements[.]"

Thereafter, Forest Grove Petitioners filed a petition for judicial review on April 8, 2024 in Case No. C-15-CV-24-1622, which was amended on April 17, 2024 without substantive changes. Also on April 8, 2024, Forest Grove Petitioners filed a petition for administrative mandamus in Case No. C-15-CV-24-1628. Thereafter, Friends of Sligo Creek and Arunkumar ("Sligo Creek Petitioners"), along with an additional individual not a party to this appeal, filed a petition for a judicial review on May 17, 2024, in Case No. C-15-CV-24-2507. The circuit court subsequently consolidated all petitions.

### JLB Realty's Contract with FGMC Expires

Meanwhile, the judicial review of the Sketch Plan took an unexpected turn. On March 27, 2024, JLB Realty's counsel filed a motion to withdraw and strike her appearance as counsel for JLB Realty, representing that "JLB's contract to purchase the Property ha[d]

21

expired" and "JLB no longer ha[d] any interest in the Property or the Sketch Plan[.]" Forest Grove Petitioners subsequently filed a motion to vacate the Planning Board's approval of the Sketch Plan, arguing: (1) the approval was void as a matter of law because the applicant, JLB Realty, "no longer ha[d] a cognizable interest" in the Property; and (2) alternatively, the approval was rendered moot because, absent a proper applicant, the decision can no longer affect anyone "with a legally cognizable interest[.]"

FGMC moved to intervene on April 30, 2024. While acknowledging that JLB Realty's contract to purchase the Property had expired "on or about March 5, 2024," FGMC's counsel—the same attorney who had represented JLB Realty—pointed out that on August 23, 2022, FGMC's managing partner signed a letter authorizing JLB Realty to file, among other things, a sketch plan application for the Property with the M-NCPPC. Counsel for FGMC asserted that because the circuit court had just granted JLB Realty's motion to withdraw, FGMC should be permitted to enter the case so it can "adopt by reference the arguments raised by JLB [Realty] (which were drafted by undersigned counsel)."

Forest Grove Petitioners opposed the motion, but on June 17, 2024, the court substituted FGMC for JLB Realty as a party to the judicial review and denied the intervention motion as moot. On July 29, 2024, the circuit court affirmed the Planning Board's approval of the Sketch Plan, finding the decision was supported by substantial evidence, was not legally erroneous, and was neither arbitrary nor capricious.

22

### *Circuit Court Denies Appellants' Petition for Judicial Review*

After the underlying petitions for judicial review and for a writ of administrative mandamus were filed and consolidated, the circuit court conducted a non-evidentiary hearing in November 2024. At the hearing, Forest Grove Petitioners maintained that the expiration of the purchase contract between JLB Realty and FGMC rendered the Resolutions void as a matter of law. In turn, Sligo Creek Petitioners challenged the merits of the Resolutions, claiming that the Plans at issue did not substantially conform to the Sector Plan's recommendations and that the Resolutions were not supported by substantial evidence. The court took the matter under advisement.

On January 23, 2025, the parties appeared in circuit court and the judge issued an oral ruling affirming the Planning Board's Resolutions. The judge first determined that the expiration of JLB Realty's purchase contract did not render the Resolutions *void ab initio*,[10]

---

[10] Here, the judge seems to adopt the language from joint memoranda filed by Petitioners in support of judicial review, in which they claimed that the Planning Board's Resolutions "should be reversed and vacated as void *ab initio*." Specifically, in the memorandums, the Petitioners argued that the Resolutions were void because "the Board had no jurisdiction to take further action" on JLB Realty's Plans once the purchase contract expired.

It is true that "[a] judicial decree or judgment made by a court lacking jurisdiction to enter it is void." *County Comm'r of Carroll Cnty. v. Carroll Craft Retail, Inc.*, 384 Md. 23, 44 (2004); *see also Facey v. Facey*, 249 Md. App. 584, 605 (2021) (observing that "judgments that are void ab initio are a nullity—as for example, a judgment rendered by a court lacking fundamental jurisdiction"). The term "jurisdiction" may "refer to either 'i) the power of a court to render a valid decree, [or] ii) the propriety of granting the relief sought.'" *Carroll Craft Retail, Inc.*, 384 Md. at 44. "It is only when the court lacks the first kind of jurisdiction . . . that its judgment is void." *Id.* This kind of jurisdiction, dubbed as "fundamental jurisdiction" by the Supreme Court of Maryland, is "the power that the law confers on a court to render judgments over a class of cases, within which a particular case may fall." *Id.* at 44-45. Our decisional law has clearly distinguished judgments "void"

(Continued)

23

explaining that the Planning Board had "broadened" the definition of "applicant" and provided the parties with sufficient notice by clarifying that term in the Sketch Plan resolution. Under this interpretation, the court found that other parties were "justified in stepping in" as applicants "once JLB no longer had a valid contract."

Next, quoting extensively from the Board Hearing record, the court found there was substantial evidence in the record to support the Planning Board's determinations that the Site Plan and Preliminary Plan substantially conformed to the Sector Plan's recommendations. Specifically, the court observed that the Sector Plan's affordable housing recommendation was "open to more than one interpretation" and found that the Planning Board was reasonable in interpreting that recommendation. Turning to the Forest Conservation Plan and tree variance, the court found at the outset that Appellants had standing because there was no dispute that they were "aggrieved persons by virtue of their ownership of nearby properties[.]" On the merits, however, the court concluded that there was sufficient evidence to support the Planning Board's approval of the Forest Conservation Plan and variance.

---

for lack of fundamental jurisdiction and those "voidable," and "[i]ndeed, . . . has repeatedly declined to hold void court or agency decisions that exceeded statutory limits but fell within the basic or fundamental jurisdiction of the court or agency." *Id.* at 45 (listing cases). Thus, "rulings made in violation of statutory restrictions on a court's authority or discretion as inappropriate *exercises* of jurisdiction [are regarded as] voidable on appeal, rather than as an inherently void excess of fundamental jurisdiction itself." *Downes v. Downes*, 388 Md. 561, 575 (2005) (emphasis in original). Because we determine that the Planning Board had jurisdiction over JLB Realty's Plans and properly exercised that jurisdiction, we conclude that the Resolutions were neither void nor voidable.

Days after the oral ruling, on January 27, 2025, the circuit court entered a written order affirming the Resolutions. Appellants timely noted this appeal.

We supplement these facts in our discussion of the issues below.

## DISCUSSION

## I.

## LEGAL FRAMEWORK

### *Overview of Laws Governing Preliminary Plan and Site Plan Approvals*

Because much of our analysis in this appeal centers upon the preliminary plan and site plan approvals, we begin our discussion with a brief outline of Montgomery County's statutory and regulatory framework governing these plans. The subdivision process generally begins with the filing of a preliminary plan, which the Subdivision Regulations define as a "drawing for a proposed subdivision submitted for approval before the preparation of a plat." MCC § 50-2.2(P). An applicant, who must either "own the property or be authorized by the owner to file the application[,]" submits the preliminary plan to the Planning Board, "together with the completed application form, supporting information, and payment of the required fee." MCC §§ 50-4.1(A)(1)-(2). Once a preliminary plan is submitted, the Planning Board must either approve, approve with conditions, or disapprove the preliminary plan. MCC § 50-4.2(C)(1). If approved, the preliminary plan is subject to a three-year "validity period,"[11] during which it must be implemented before it becomes

---

[11] Specifically, Section 50-4.2(G)(2)(a) of the County Code provides that a preliminary plan for a single-phase project approved after March 31, 2017, remains valid for three years from its initiation date, whereas a preliminary plan approved after March

(Continued)

void. MCC §§ 50-4.2(G), (I). After a subdivision plan is approved, an applicant may request that the approval be vacated by presenting "proof of ownership and notarized signatures of all property owners or other persons who are authorized by the property owner." MCC § 50-4.2(K).

A preliminary plan may be filed in tandem with the site plan, which "provides a detailed overview of the applicant's development" to ensure that "the proposed development satisfies current laws, regulations, . . . and substantially conforms with the recommendations of the applicable master plan and approved guidelines." MCC § 59-7.3.4(A)(4). Although the preliminary plan and the site plan are governed by distinct chapters of the County Code—the Subdivision Regulations and the Zoning Ordinance, respectively—they require a similar set of findings for the Planning Board's approval, including that the proposed development satisfies all requirements under the Forest Conservation Law and "substantially conforms" with the applicable master plan. MCC § 50-4.2(D)(2); MCC § 59-7.3.4(E)(2)(g). The Zoning Ordinance further provides that, after a site plan is approved, the "property owner may apply for a site plan amendment to change a certified site plan." MCC § 59-7.3.4(J).

Before an applicant may submit a preliminary plan or site plan for approval, the applicant must submit a forest stand delineation to the Planning Director. MCC § 22A-11 (b)(1). Once notified that the forest stand delineation is complete and correct, the applicant

_____

31, 2009, and before April 1, 2017, remains valid for five years. In the instant appeal, the Resolutions confirm that the Preliminary Plan would remain valid for three years.

26

must submit a forest conservation plan to the Planning Director concurrently with any preliminary plan of subdivision or site plan. MCC § 22A-11 (b)(2). "Compliance with the preliminary forest conservation plan, when required and as amended by the Board, must be made a condition of any approval of the first applicable development application." MCC § 22A-11 (b)(2)(C).

### Standard of Review

In an appeal from judicial review of a final administrative agency decision, "we look 'through' the decision of the circuit court and review the decision of the agency." *Mayor and Council of Rockville v. Pumphrey*, 218 Md. App. 160, 193 (2014) (quoting *People's Ins. Counsel Div. v. Country Ridge Shopping Ctr., Inc.*, 144 Md. App. 580, 591 (2002)) (cleaned up). When reviewing an administrative agency's decision, our role is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised on an erroneous conclusion of law." *Clarksville Residents Against Mortuary Def. Fund, Inc. v. Donaldson Props.*, 453 Md. 516, 532 (2017) (citation omitted).

We review an agency's factual findings and conclusions under the "substantial evidence" standard, and apply that same test to mixed questions of law and fact. *Matter of Cricket Wireless, LLC*, 259 Md. App. 44, 66 (2023). Our decisional law defines "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gigeous v. E. Corr. Inst.*, 363 Md. 481, 497 (2001) (quoting *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 512 (1978)). Thus, in applying the substantial evidence test, we must "decide whether a reasoning mind

27

reasonably could have reached the factual conclusion the agency reached." *Fire & Police Emps.' Retirement Sys. of City of Balt. v. Middleton*, 192 Md. App. 354, 359 (2010). That said, we cannot substitute our judgment for that of the administrative agency in reviewing its findings of fact. *Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 293-94 (2017) (citation omitted). Rather, so long as some basis exists for the agency's factual findings, "that would be enough, in and of itself, to satisfy the substantial evidence test." *Md. Bd. of Physicians v. Elliot*, 170 Md. App. 369, 386 (2006). Nevertheless, the agency's "[f]indings of fact must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions." *Becker v. Anne Arundel Cnty.*, 174 Md. App. 114, 139 (2007) (citation omitted).

We review the administrative agency's legal conclusions *de novo* for correctness. *Comptroller of Md. v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 360 (2022). As the Supreme Court of Maryland explained, questions of law "encompass[] a variety of legal challenges, including: (1) the constitutionality of an agency's decision; (2) whether the agency had jurisdiction to consider the matter; (3) whether the agency correctly interpreted and applied applicable case law; (4) and whether the agency correctly interpreted an applicable statute or regulation." *Id.* Typically, when interpreting a statute, "we look . . . to the plain language of the statute, giving it its natural and ordinary meaning to determine the purpose of the legislative body which enacted it." *Anne Arundel Cnty. v. 808 Best Gate Realty, LLC*, 479 Md. 404, 420 (2022) (cleaned up). We read the statute "as a whole so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Koste v. Town of Oxford*, 431 Md. 14, 25-26 (2013) (internal quotation marks

28

and citations omitted). In addition, "[w]e neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute[.]" *Lockshin v. Semsker*, 412 Md. 257, 275 (2010) (internal quotation marks and citations omitted). Rather, "[w]e presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* at 276. Finally, when interpreting a county code or local ordinance, we "apply the same canons of construction . . . as we apply to the interpretation of state statutes." *808 Best Gate*, 479 Md. at 420.

To be clear, "we may apply a degree of deference to an administrative agency's legal conclusion to the extent it is 'premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose.'" *FC-GEN*, 482 Md. at 362 (quoting *Broadway Servs. Inc. v. Comptroller of Md.*, 478 Md. 200, 214-15 (2022)). For example, if the plain language of the statute leaves room for interpretation regarding its meaning, we "give some weight to the construction given the statute by the agency responsible for administering it." *Magan v. Med. Mut. Liab. Ins. Soc'y of Md.*, 331 Md. 535, 546 (1991). Moreover, "[w]hen an agency clearly demonstrates that it has focused its attention on the statutory provisions in question, thoroughly addressed the relevant issues, and reached its interpretation through a sound reasoning process, the agency's interpretation will be accorded the persuasiveness due a well-considered opinion of an expert body." *Balt. Gas & Electric Co. v. Pub. Serv. Comm'n of Md.*, 305 Md. 145, 161-62 (1986). However, "[w]e are under no constraint . . . to affirm an agency decision

29

premised solely upon an erroneous conclusion of law." *Lillian C. Blentlinger*, *LLC*, 456 Md. at 293 (citation omitted). Rather, when a party challenges an agency's interpretation of the statute that the agency is charged with administering, it is the reviewing court's role to "assess how much weight to accord that interpretation, keeping in mind that it is always within the court's prerogative to determine whether an agency's conclusions of law are correct.'" *FC-GEN*, 482 Md. at 362 (cleaned up).

Finally, we note that "judicial review of the actions of an administrative agency is restricted primarily because of the fundamental doctrine of separation of powers" established in the Maryland Constitution. *Sadler v. Dimensions Healthcare Corp.*, 378 Md. 509, 530 (2003). Accordingly, when an appeal from a circuit court's judicial review involves a "matter to be resolved exclusively by the court[,]" this Court may not "apply the conventional standard of review . . . whereby we 'look through' the circuit court's ruling and directly evaluate the decision of the agency." *Matter of Carpenter*, 264 Md. App. 138, 147-48 (2024) (citation omitted). For example, "whether a party has standing to file a petition for judicial review is an issue that we review *de novo*." *Id.* at 148. Similarly, where, as here, a party claims that an administrative agency's decision is void as a matter of law, we review whether the circuit court was "legally correct" in *its* determination. *See Halici v. City of Gaithersburg*, 180 Md. App. 238, 249 (2008) (explaining that "a challenge to the statutory authority of the administrative body to take the action at issue" is a "purely legal issue" that may be considered by the reviewing court "at any time, even if it were not raised before the agency"). Because the resolution of this issue requires statutory interpretation, which is a question of law, we review the circuit court's decision *de novo*.

*M-NCPPC v. Anderson*, 395 Md. 172, 181 (2006).

## II.

### THE PLANNING BOARD'S APPROVALS ARE NOT VOID

#### *Parties' Contentions*

As a preliminary matter, Appellants contend that the Planning Board's Resolutions were "void as a matter of law." Appellants claim that FGMC's August 23, 2022 letter, which authorized JLB Realty to act on FGMC's behalf, expressly limited such authorizations to JLB Realty's actions as a contract purchaser of the Property. Therefore, according to Appellants, "there was no legally cognizable applicant" after JLB Realty's purchase contract with FGMC expired on March 5, 2024—two days before the Board Hearing—and, by extension, "there was no valid application for the Planning Board to consider, let alone approve." Appellants assert that despite the expiration of the purchase contract, JLB Realty "negotiated with the Planning Board on several proposed conditions for the development" during the Board Hearing and sought modifications on those conditions "based on financial constraints specific to JLB Realty."

FGMC counters that Appellants' argument ignores JLB Realty's "clear authority to continue to act on behalf of [FGMC] even after expiration of its contractual interest[.]" Specifically, FGMC highlights that "there is absolutely no language in the [August 23, 2022] letter to indicate JLB Realty's scope of authorization was limited to its capacity as contract purchaser or to its particular redevelopment plans." Rather, according to FGMC, the August 23, 2022 letter authorizes JLB Realty to, among other things, "*act on behalf of* [FGMC] *in furtherance of such Applications*." (Emphasis in the brief). FGMC adds that

31

Appellants' "bald assertion" that JLB Realty could not act as the applicant on its behalf "is perplexing, to say the least, as it ignores the reality that the Property Owner—the party defending this appeal—explicitly acknowledges that the Contract Purchaser was authorized to continue to pursue the entitlements, which now bind the *Property Owner's* land, through the hearing." (Emphasis in the brief).

FGMC also contends that development approvals, including the Preliminary Plan, Site Plan, and Forest Conservation Plans, "run with the land" and therefore do not become void just because ownership or interests change. Holding otherwise, according to FGMC, "would make developing real estate an untenable investment[,]" as "the years-long approval process must restart from scratch every time interests in the property change."

The Planning Board, as a co-appellee, similarly argues that "[l]and use approvals . . . must be tied to [the land] regardless of applicant or owner" and therefore, even if JLB Realty no longer has any legally cognizable interest in the outcome of the approval proceedings, that "does not mean . . . that the Planning Board's approval of the Preliminary, Site, and Forest Conservation Plans was somehow 'void as a matter of law,' as claimed by Appellants." The Planning Board asserts that "[i]t is not uncommon for the original applicant to change before the project gets to the building permit stage[,]" and contends that "'[l]and use approvals are just as they sound; they relate to, benefit, and burden the land and must be tied to it regardless of applicant or owner.'"

In reply, Appellants claim that Appellees' argument that the Planning Board approvals in this case run with the land is inapposite because "[t]his case does not involve a change in ownership or change in the applicant *after* a plan has been lawfully approved[.]"

Appellants clarify that they do not claim development approvals become void when changes of ownership or interests occur. Rather, Appellants contend that "the public has a right to know" the identity of the entity that has an interest in the Property, and asks this Court "to confirm that the identity of the applicant must be disclosed prior to the required public hearing[.]"

*Relevant Law*

Both the Subdivision Regulations and the Zoning Ordinance require that an applicant filing a preliminary plan, sketch plan, or site plan "must own the subject property or be authorized by the owner to file the application." MCC §§ 50-4.1(A)(2); MCC § 59-7.3.3 (B)(1); MCC § 59-7.3.4(B)(1). Although the Zoning Ordinance does not further define the term "applicant," Section 2.2(A) of the Subdivision Regulations defines "Applicant, Developer or Subdivider" as follows:

> An individual, partnership, corporation, or **other legal entity and its agent** that undertakes the subdivision of land or the activities covered by this Chapter. **The terms include all persons involved in successive stages of the project, even though such persons may change and ownership of the land may change.** Each term includes the other.

MCC § 50-2.2(A) (Emphasis added).

Maryland law defines "agency" as a "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Comptroller of Md. v. Broadway Servs., Inc.*, 250 Md. App. 102, 114 (2021) (quoting Restatement (Second) of Agency § 1 (Am. L. Inst. 1958)), *aff'd*, 478 Md. 200 (2022). More recently, this Court also observed:

[a]n agency relationship "is a legal concept which depends upon the existence of required factual elements: the manifestation [of consent] by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking."

*Haw v. NCAA*, 260 Md. App. 310, 361 (2024) (quoting Restatement (Second) of Agency § 1, cmt. (1958)).  Although the existence of an agency relationship is ordinarily a question of fact, "where only one inference may be drawn from the evidence, it is proper for the court to find the existence of [the] agency relationship as a matter of law."  *Green v. H&R Block*, 355 Md. 488, 505 (1999).

Under Maryland law, a party may be deemed an agent based on either actual or apparent authority.  *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 565 (2008). As the Supreme Court of Maryland observed, "[a]ctual authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's account." *Citizens Bank of Md. v. Md. Indus. Finishing Co. Inc.*, 338 Md. 448, 459 (1995) (quoting Restatement (Second) of Agency § 26).  Put differently, "[t]he relation of principal and agent does not necessarily depend upon an express appointment and acceptance thereof, but it may be implied from the words and conduct of the parties and the circumstances." *Green*, 355 Md. at 503 (internal quotation marks and citation omitted).  Thus, in determining whether an actual agency relationship exists, a reviewing court may look to the parties' conduct, including acquiescence, to ascertain their intent to form such relationship. *See Dickerson v. Longoria*, 414 Md. 419, 442 (2010).

Our decisional law has highlighted three specific factors as relevant to the

34

determination of an agency relationship: "(1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent." *Haw*, 260 Md. App. at 361 (quoting *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 27 (2005)) (cleaned up); *Broadway Servs. Inc. v. Comptroller of Md.*, 478 Md. 200, 216 (2022). To be clear, however, these are "neither exclusive nor conclusive considerations in determining the existence of an agency relationship" and should be viewed "within the context of the entire circumstances of the transaction or relations." *Green*, 355 Md. at 506. Ultimately, "the presence of an agency relationship 'turns on the parties' intentions as manifested by their agreements or actions.'" *Andrews & Lawrence Pro. Servs., LLC v. Mills*, 467 Md. 126, 166 (2020) (quoting *Green*, 355 Md. at 503).

Even when "the legal definition of actual agency is not satisfied, the parties may still have an 'apparent agency' relationship[.]" *Williams v. Dimensions Health Corp.*, 480 Md. 24, 32 (2022). The Supreme Court of Maryland has instructed that "a principal can be bound by the acts of a purported agent when that person has apparent authority to act on behalf of the principal." *Dickerson*, 414 Md. at 442; *Patten v. Bd. of Liquor License Comm'rs for Balt. City*, 107 Md. App. 224, 237 (1995) (noting that a purported agent for a partnership, if compliant with "apparent agency requirements, can legally represent and bind [the] partnership"). The apparent agency relationship "results from certain acts or manifestations by the alleged principal to a third party leading the third party to believe that an agent had authority to act." *Klein v. Weiss*, 284 Md. 36, 61 (1978) (holding that general partners did not have apparent authority to revise or alter the partnership certificate

35

and agreement without the limited partners' consent, where the general partners were only authorized to handle the documents); *see also Bradford v. Jai Med. Sys. Managed Care Org.*, 439 Md. 2, 18 (2014) (discussing the doctrine of apparent agency in the context of tort liability).

### *Analysis*

At the outset, we find no legal authority—statutory or otherwise—to support Appellants' contention that a subdivision or site plan applicant who happens to be the contract purchaser of the property in question is precluded from pursuing the subdivision or site plan application upon the expiration of the purchase contract. [12] Similarly, Appellants can point to no law that requires that the developer of a property must have any ownership interest in the property, or any contract or option to purchase the property. Rather, when read as a whole, the County Code consistently tethers a non-owner's standing as an "applicant" to the party's authorization to *file* the application. For example, Section 4.1(A)(2) of the Subdivision Regulations provides that an applicant or subdivider "must own the property or be authorized by the owner *to file* the [preliminary plan] application." MCC § 50-4.1(A)(2) (emphasis added). Similarly, as noted, Section 7.3.4 of the Zoning

---

[12] Both FGMC and the Planning Board emphasize that the Resolutions "run with the land" and are "tied to [the land] regardless of applicant or owner." We agree with Appellants, however, that this argument is wide of the mark. As Appellants highlight in their reply brief, "[t]his case does not involve a change in ownership or change in the applicant *after* a plan has been lawfully approved[.]" (Emphasis in the original). In fact, Appellants do not deny that the applications, *once approved*, may run with the land. They argue, instead, that the expiration of JLB Realty's purchase contract occurred prior to the March 27, 2024 hearing, and thus divested the Planning Board of its authority to approve the Plans.

36

Ordinance provides that a site plan applicant "must own the subject property or be authorized by the owner *to file* the application." MCC § 59-7.3.4(B)(1) (emphasis added). These provisions allow for a non-owner applicant, such as JLB Realty, to qualify as an applicant if it has authorization from the owner "to file" the application. *See Lockshin v. Semsker*, 412 Md. 257, 275 (2010) ("We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute[.]").

Our interpretation is further corroborated by Section 2.2(A) of the Subdivision Regulations, which broadly defines an applicant as an "individual, partnership, corporation, or other legal entity and its agent that undertakes the subdivision of land[,]" including "all persons involved in successive stages of the project, even though such persons may change and ownership of the land may change." MCC § 50-2.2(A). This provision expressly contemplates that the entities involved in a project may shift over time—and even ownership of the land itself may change—without undermining the validity of the application. Furthermore, the County Code does not contain any provision authorizing, much less requiring, the Planning Board to dismiss a site plan or preliminary plan when an applicant loses an interest in the project after filing the application. To the contrary, Section 4.2 of the Subdivision Regulations mandates that the Planning Board "must take" one of three specific actions on any preliminary plan: approval, disapproval, or approval with conditions. MCC § 50-4.2(C)(1). The only mention of "voiding" a plan is found in Sections 4.2(H) and (I), which apply solely when a preliminary plan's validity period expires. *See* MCC §§ 50-4.2(H)(2), (I)(1), (I)(3). Because there is no dispute that JLB Realty was properly authorized by FGMC to file the Plans, the expiration of the purchase

contract did not preclude the Planning Board from considering and approving the Plans.

Above all, the record in this case established that at the time of the Board Hearing, JLB Realty maintained the actual authority to pursue—and otherwise act in furtherance of—the Plans as the developer and agent of FGMC. As noted, an actual agency-principal relationship may be established "by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's account." *Citizens Bank of Md.*, 338 Md. at 459 (quoting Restatement (Second) of Agency § 26) (internal quotation marks omitted). The purchase contract and its expiration date do not determine the issue, and tellingly, neither party introduced the document into the record. What is most relevant are the written words contained in FGMC's authorization letter to JLB Realty dated August 23, 2022, and the subsequent conduct of the principal, here FGMC.

*The Authorization Letter*

The August 23 letter explicitly authorizes JLB Realty "to sign for, file, and pursue any and all applications . . . *on behalf of Forest Glen Medical Center LLP*, in connection with JLB Realty['s] *redevelopment* at the Propert[y]." (emphasis added). The letter further states that JLB Realty "is specifically authorized to (i) *execute all necessary application* forms and documents, (ii) obtain plans and drawings, and (iii) act *on behalf of Forest Glen Medical Center LLP* in furtherance of such [a]pplications." (emphasis added). As such, the plain language of this authorization letter satisfies the three hallmarks of an agency relationship that we highlighted in *Haw v. NCAA*, 260 Md. App. 310, 361 (2024). *First*, JLB Realty was given the power to alter the legal relations of FGMC, the principal, by

38

filing and obtaining approval of applications—including the Plans—related to the development of the Property. *Second*, the August 23, 2022 letter obligated JLB Realty to act primarily for FGMC's benefit by pursuing the Plans, which, if approved, would benefit the Property's owner regardless of whether JLB Realty would ultimately purchase it. *Third*, FGMC maintained the right to control JLB Realty as an agent, as the letter authorized JLB Realty to act only "on behalf of" FGMC "in connection with" the proposed development, and FGMC, as the Property's owner, retained statutory rights to seek a site plan amendment or to request vacating an approved subdivision plan. *See* MCC §§ 50-4.2(K)(2) ("A request to vacate an approved subdivision plan must include proof of ownership and notarized signatures of all property owners."); 59-7.3.4(J) ("Any property owner may apply for a site plan amendment to change a certified site plan."). Appellants' contention that this agent-principal relationship was contingent upon JLB Realty's status as a "contract purchaser[,]" is refuted by the August 23 authorization letter, which contains no such limitation.[13]

---

[13] Notably, although no reported Maryland case has directly spoken to this issue, multiple courts outside Maryland have observed that the rights and obligations of the parties to a land sale contract do not necessarily terminate when the contract "expires." As the Appellate Court of Connecticut explains:

> Once the time limitation passes in an option contract, the authority to accept the offer and to establish a binding purchase and sale agreement no longer exists. . . . **This case, however, does not deal with an option contract, but with a contract to purchase land. Unlike in option agreements, a buyer and seller in a contract to purchase land undertake mutual promises for the purchase and sale of the property. Those obligations are not necessarily extinguished after the specified closing date passes.**

(Continued)

39

*Conduct of the Parties*

The ongoing authorization of JLB Realty to "act on behalf of Forest Glen Medical Center LLP in furtherance of such [a]pplications" is further established by the conduct of the parties. FGMC never revoked the authorization letter, nor did it object to JLB Realty's continued advocacy during the Board Hearing—even though, as FGMC acknowledges, the purchase contract had expired by that time. When FGMC intervened in the judicial review of the Sketch Plan, it expressly identified itself as the "successor to JLB" in regard to the Plan, and argued that, without JLB Realty, its interests would be inadequately represented, thus confirming that JLB Realty had been representing FGMC's interests all along. Indeed, FGMC retained the same counsel who had represented JLB Realty in defense of the Sketch Plan and the Plans. Counsel for FGMC appeared with the JLB Realty team at the Board Hearing on March 7, 2024, to defend the preliminary plan and site plan applications. FGMC has continuously maintained the same counsel throughout this litigation, along with its position that JLB Realty had "clear authority" to act on its behalf "even after expiration of its contractual interest[.]"

Finally, Appellants' argument that the Planning Board's failure to consider the expiration of the purchase contract "constitutes a fundamental procedural flaw" has no merit, not only because the issue was not brought to the Board's attention, but also—to the

*Bethlehem Christian Fellowship, Inc. v. Plan. & Zoning Comm'n of Town of Morris*, 755 A.2d 249, 253 (Conn. App. 2000) (footnote omitted) (emphasis added); *see also Mola Dev. Corp. v. City of Seal Beach*, 57 Cal. App. 4th 405, 415 (1997) (recognizing that developers have standing to challenge a city's decision on a proposed development "even if they have not yet concluded an agreement with the property owner to acquire the site, and even if their contract with the property owner have terminated or expired") (citation omitted).

extent that the Planning Board did not have complete information as to the current relationship between the JLB Realty and FGMC—it was not an omission that would have prejudiced Appellants so as to warrant voiding the Resolutions.[14]  In *Beall v. Montgomery County Council*, 240 Md. 77 (1965), which we find instructive, the Supreme Court of Maryland addressed a zoning application that was signed by only one property owner, who held a seven-and-one-half percent interest in the subject property, and did not include any of the co-owners as required by relevant provisions of the Montgomery County Zoning Ordinance.  *Id.* at 88-89.  In rejecting the appellant's argument that the failure to include co-owners on the application constituted reversible error, the Supreme Court observed:

> [Z]oning ordinances are concerned with the use of property, the height of buildings and the density of population.  They are not concerned with the ownership of the property involved and title to real property is not tried in zoning cases. . . . There was obviously no prejudice to the appellants from not listing the names and addresses of all the owners.

---

[14] Indeed, although the Appellants emphasize that there were  no "applications, signatures, or notifications . . . that would signal a 'change' in the 'original applicant'" before the Board Hearing, JLB Realty's sketch plan, preliminary plan, and site plan applications—all available on Montgomery County Planning Department website—clearly identify JLB Realty as "owner's representative or contract purchaser" and bear the signature of J. Graham Brock as an applicant "legally authorized to represent the owner(s)[.]" *See* Montgomery Cnty. Plan.  Dep't, *Preliminary Plan Application*, available at https://montgomeryplanning-md-us-projectdoxwebui.avolvecloud.com/File/FileViewer?fileID=511944.  Furthermore, JLB Realty's application notice list expressly identified FGMC, including its tax account number and mailing address, as the only entity identified under the "Subject Property" heading. *See* Montgomery Cnty. Plan.Dep't, *Notice List*, https://montgomeryplanning-md-us-projectdoxwebui.avolvecloud.com/File/FileViewer?fileID=511284.   We  therefore conclude that the Board and the Appellants were on sufficient notice before the Board Hearing that JLB Realty was not the owner of the Property and was defending the Plans as FGMC's agent.  This is not a case where there was a concealed transfer of development rights to a new developer or owner.

*Id.* at 88. We find that the same rationale is applicable where, as here, the Appellants challenges the Planning Board's decision based on an applicant's contractual or proprietary interest in the subject property. Even if Appellants had established that the expiration of the purchase contract somehow created an irregularity in the application and approval process, which they have not, such irregularity would not affect the validity of the Resolutions. *See id.* at 89 ("Mere irregularities in an application to a board for a permit not amounting to a jurisdictional defect do not affect the validity of the permit.").

For all of these reasons, we hold that the expiration of JLB Realty's purchase contract with FGMC did not extinguish JLB Realty's authority to pursue any and all applications and approvals on behalf of FGMC in connection with redevelopment of the Property. Accordingly, we affirm the circuit court's determination that the Planning Board's Resolutions are not void as a matter of law.

## III.

## SUBSTANTIAL COMPLIANCE

### *Parties' Contentions*

Appellants claim that neither the Site Plan nor the Preliminary Plan "substantially conform[ed]" to the recommendations of the Sector Plan, which, according to Appellants, "must be treated as a true regulatory device and interpreted in a similar manner to any other authoritative statute." Appellants point out "several inconsistencies and deficiencies in the Preliminary Plan and Site Plan that render these plans non-conformant with the Sector Plan." *First*, Appellants assert that "[n]o explanation is provided for the drastic discrepancy between the 1.25 acre figure reported in the Sector Plan and the 0.43 acre figure cited in

42

the staff report[.]" In turn, Appellants assert that the Plans fail to conform to the Sector Plan's recommendation to provide an area of equal environmental benefit as the existing forest. *Second*, Appellants maintain that "JLB Realty's development Plans fail to meet both the requirement that five percent of the units be three-bedroom units and the requirement that 10 percent of the units be provided as affordable housing."

FGMC and the Planning Board both respond that "'[s]ubstantial conformance' is a more forgiving standard than simple, pure, strict 'conformance'" and that Appellants "completely ignore the adverb 'substantially[.]'" Both contend that the Planning Board's approval of the Preliminary Plan and Site Plan was supported by substantial evidence, such as the Staff Report and the Board Hearing testimony.

FGMC urges that the Planning Board is entitled to deference in balancing various "goals and objectives, not necessarily consistent when applied to a specific property." The Board asserts that Appellants' argument that it should have undertaken a "comparative analysis" in order to determine "equal environmental benefit" is "not required by the Code or the Sector plan. . . . Appellants have invented this 'requirement.'"

FGMC highlights that, at the hearing, Planning Board staff did "explain[] in great detail" how the Plans substantially conformed, and why the 1.25 acres of forest mentioned in the Sector Plan was not an accurate measurement. Additionally, the Staff Report explained that the .43 acres of existing forest "is heavily impacted by non-native plan[t]s and is not a healthy, regenerative ecosystem." According to FGMC, the Planning Staff recognized that the "development proposal would include numerous environmental benefits, including tree canopy cover, lawn areas, biofiltration areas, solar facilities, new

43

plantings of stratified vegetation throughout the site, stormwater management facilities, and open spaces." Finally, FGMC points out that Maggie Gallagher testified on behalf of DHCA that the "sector Plan's language was that *only five percent of the units reserved as MPDUs* need be three-bedroom[.]"

In reply, Appellants maintain that "[t]he binding effect of master plan recommendations is not voided by the phrase 'substantial conformance'" and that it is "outdated and unlawful" to treat the Sector Plan recommendations as non-binding. Among other things, Appellants further allege that Maggie Gallagher, on behalf of the DHCA, had "distort[ed]" the recommendations during the Board Hearing, and that "the Planning Board's decision to endorse Ms. Gallagher's unlawful views is not 'fairly debatable.'"

### *Relevant Law*

As a general matter, our decisional law has established that "[i]n the context of land-use regulation, 'plans, which are the result of work done by planning commissions and adopted by ultimate zoning bodies, are advisory in nature and have no force of law absent statu[t]es or local ordinances linking planning and zoning." *City of Hyattsville v. Prince George's Cnty. Council*, 254 Md. App. 1, 53-54 (2022) (quoting *Mayor & Council of Rockville v. Rylyn Enters., Inc.*, 372 Md. 514, 530 (2002)). Thus, "[p]roposals for land use contained in a plan[,]" such as the Sector Plan at issue here, typically "constitute a non-binding advisory recommendation, unless a relevant ordinance or regulation, or specific zoning, subdivision, or other land use approval, make compliance with the plan recommendations mandatory." *Id.* at 54 (quoting *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 522 (2015)); *see also Pattey v. Bd. of Cnty. Comm'rs*,

44

271 Md. 352, 360 (1974) ("[A] master plan is only a guide and is not to be confused with a comprehensive zoning, zoning map, or zoning classification[.]")

Having said that, as the Supreme Court of Maryland observed, "master plans are not invariably advisory." *Boyds Civic Ass'n v. Montgomery Cnty. Council*, 309 Md. 683, 699 (1987). Rather, "where the local government has enacted a statute, ordinance, or regulation that links planning and zoning, 'they serve to elevate the status of comprehensive plans to the level of true regulatory device.'" *Md.-Nat. Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 100-01 (2009) (quoting *Rylyns Enters.*, 372 Md. at 530). In cases involving subdivision matters and preliminary plans, "it is equally well established that the recommendations of a master plan may be binding to the extent there is a statute, regulation, or ordinance requiring that a proposed subdivision conform to the master plan." *Id.* at 100. "[W]here such a statute or ordinance exists, its effect is usually that of requiring that zoning or other land use decisions be consistent with a plan's recommendations regarding land use[.]" *Rylyns Enters.*, 372 Md. at 531.

Therefore, determining the weight to be accorded a master plan recommendation is largely a matter of statutory interpretation. As we explained:

> **[T]he weight to be accorded a master plan or comprehensive plan recommendation depends upon the language of the statute, ordinance, or regulation establishing the standards pursuant to which the decision is to be made.** The specific types of governmental land use decisions clearly embraced by that principle are rezonings, special exceptions, and subdivision approvals. **In such cases, we look first to the words of the applicable statute, ordinance, or regulation to divine what the enabler intended the weight to be accorded by the ultimate decision-maker to a recommendation of the plan. This becomes largely an exercise in statutory construction.**

45

*Trail v. Terrapin Run, LLC*, 174 Md. App. 43, 53-54 (2007), *aff'd*, 403 Md. 523 (2008) (citation omitted) (emphasis added).

*Analysis*

Applying the foregoing principles, we conclude that the plain language of the governing statutes in the instant appeal does not reflect a legislative intent to mandate that the Plans at issue strictly comply with the Sector Plan; but rather, that the Plans "substantially conform" to the Sector Plan.

We begin with Section 4.2 of the Subdivision Regulations, which provides, in relevant part: "[t]o approve a preliminary plan, the Board must find that . . . the preliminary plan substantially conforms to the master plan[.]" MCC § 50-4.2(D)(2). Likewise, under Section 7.3.4(E) of the Zoning Ordinance, the Planning Board "must find" that a proposed site plan "substantially conforms with the recommendations of the applicable master plan and any guidelines approved by the Planning Board that implement the applicable plan[.]" MCC § 59-7.3.4(E)(2)(g).

In their opening brief, Appellants rely on *HNS Development, LLC v. People's Counsel for Baltimore County*, 200 Md. App. 1, 35 (2011), *aff'd*, 425 Md. 436 (2012), to argue that these statutory provisions "elevate[]" the Sector Plan "to the status of a true regulatory device," rendering the recommendations therein "mandatory."

To the extent Montgomery County Code has "elevated" the 2020 Forest Glen/Montgomery Hills Sector Plan Sector Plan by requiring the Planning Board demand substantial conformance to master plan (or sector plan) recommendations, *see Greater Baden-Aquasco*, 412 Md. at 100-01, we observe that substantial conformance is not the

46

same as strict conformance. We have explained that even when a sector plan is binding on the Planning Board in terms of what the Board "must find," the Sector Plan's specific "recommendations" may remain "aspirational rather than mandatory." *Pringle v. Montgomery Cnty. Plan. Bd. M-NCPPC*, 212 Md. App. 478, 489 (2013). To hold otherwise would require us to read "recommendations" as "requirements," and equate "substantial conformance" with mere "conformance," running contrary to our canons of statutory interpretation. *See Koste v. Town of Oxford*, 431 Md. 14, 25-26 (2013).

Indeed, the Sector Plan itself lacks mandatory directives, instead consistently employing the terms "should" rather than "shall," and "recommends" rather than "requires." For example, the Sector Plan's housing recommendation provides:

> Any optional method project that includes residential dwelling units **should** provide a minimum of 15 percent [Moderately Priced Dwelling Units]. In addition, with redevelopment, a minimum of 25 percent of the units **should** be two-bedroom units and five percent of the units **should** be three-bedroom units. Additionally, given the substantial investment by the County in the Metro access tunnel construction, the Plan **recommends** 10 percent of the units also be provided as affordable to households earning at or below 100 percent of Area Median Income (AMI).

(Emphasis added). In its environmental recommendation, the Sector Plan similarly employs discretionary language.

> With respect to the remnant forest, at the time of redevelopment, maximum flexibility on the site **should** be given for providing an area of equal environmental benefit that also provides for improved community benefit and access. Equal environmental benefits may include improved water and air quality, strategies that provide for reduced greenhouse gas emissions and increased biodiversity and habitat protections, including improved tree canopy. Development **should** also, as a part of its open space requirement, preserve healthy indigenous trees and replant stratified vegetation **where possible**.

47

(Emphasis added). Numerous courts in Maryland and other jurisdictions have recognized that the word "should" generally indicates a "mere recommendation." *See Pringle*, 212 Md. App. at 489-92 (discussing cases).

The discretionary language woven throughout the Montgomery County Code distinguishes the instant appeal from *HNS Development*. In *HNS Development*, a developer challenged the decision by the Baltimore County Board of Appeals, which denied an amendment to a proposed development plan for noncompliance with the Baltimore County Master Plan. 200 Md. App. at 5. Rejecting the developer's argument that the "Master Plan is a guide and not a rule[,]" we observed:

> Here, direct statutory provisions—[Baltimore County Code ("BCC")] § 26-166(a) of the 1988 [BCC], providing: "**All development of land must conform to the master plan**, including adopted community plans and these regulations . . . " and the current [BCC] § 32-4-102(a)(1), providing: "Subject to limitation in the Charter, **all development of land shall conform to: The Master Plan**; . . ."—support the conclusion that the Master Plan is binding.

*Id*. at 35 (emphases added). In affirming our decision, the Supreme Court of Maryland further highlighted that

> **according to the Baltimore County Code, the Master Plan is an inextricable part of the development regulations and, as such, compliance with its recommendations is a binding regulatory requirement of the subdivision and development plan review process in the County.** Thus, nonconformity with the Master Plan can provide a valid and an independent basis for denying approval of a proposed amended development plan, compliance with the other requirements of the development regulations notwithstanding.

*HNS Dev. LLC v. People's Counsel for Balt. Cnty.,* 425 Md. 436, 448 (2012) (emphasis added).

48

Returning to the record on appeal, substantial evidence supports the Planning Board's determination that the Preliminary Plan and Site Plan substantially conformed to the Sector Plan's recommendations. Included in the record is the 83-page Staff Report, in which Planning Staff detailed how JLB Realty achieved substantial conformance with the Sector Plan's recommendations regarding, among other things, urban design, parks, traffic safety, environment, and affordable housing. Specifically, the Staff Report extensively evaluates the development's environmental impact on the Property by describing the degraded state of the existing forest and then contrasting it with JLB Realty's proposal to plant "native trees, shrubs, perennials, grasses, and groundcover that provide a mix of habitat and food sources" for local fauna. Given the extensiveness of the Staff Report and supporting testimony from Planning Staff, we conclude that the Planning Board's findings were far from a mere enumeration of "statutory criteria, broad conclusory statements, or boilerplate resolutions." *Becker v. Anne Arundel Cnty.*, 174 Md. App. 114, 139 (2007) (citation omitted). Rather, the record before the Planning Board was "enough, in and of itself, to satisfy the substantial evidence test." *Md. Bd. of Physicians v. Elliot*, 170 Md. App. 369, 386 (2006).

In attempt to persuade us otherwise, Appellants allege "several inconsistencies and deficiencies" in the Staff Report's environmental analysis. First, as previously mentioned, Appellants claim that Planning Staff failed to sufficiently explain the discrepancy between the forest acreage of 1.25 in the Sector Plan and the 0.43 acreage reported by Staff. We disagree. Amy Lindsey explained at the Board Hearing that the discrepancy occurred because the area noted on the Sector Plan is not always exact:

49

Now, the Sector Plan . . . do[es] state an acreage of forest. However, forest is actually determined through the regulatory process, and we don't get into exactly what is forest, what is not forest until we are reviewing a regulatory plan.

So for example, sometimes there can be 10 or 20 years in-between when we make recommendations for the Sector Plan and when we see a Regulatory Plan. Additionally, when we are doing -- when we're making Sector Plan recommendations and writing descriptions, we're not going out and doing all of the detailed field work required to make those determinations. So those are the first two things I kind of want to separate.

So the Forest Conservation Plan is based on the Natural Resource Inventory that was submitted and reviewed. And the acreage was determined by looking at not only the number of stems and trees that are in the area, but also how deep the area is and what the acreage of the area is. So for example, a tiny area that's maybe, you know, 1000 square feet would not qualify. So there are regulatory -- there are legal definitions of what is forest and what is not forest.

Appellants also claim that the Staff Report gave "[n]o consideration . . . to the Sector Plan's express recommendation to prioritize the preservation and restoration of existing forest cover." Again, we disagree. As this Court observed, "there is no requirement that the Board must set out in its findings of fact a discussion of all of the evidence." *Heard v. Cnty. Council of Prince George's Cnty.*, 256 Md. App. 586, 636 (2022) (citation omitted). Moreover, contrary to Appellants' claim, both the Staff Report and the Planning Board's Resolutions expressly recognize that the Sector Plan identifies "affordable housing and habitat preservation and restoration as the top public benefit[.]" These objectives were further addressed by Lindsey's testimony, which detailed physical and topographical constraints that made it very difficult to preserve the existing forest on the Property.

The record further establishes that the Planning Board was reasonable in finding

50

substantial conformance to the Sector Plan's affordable housing recommendations. Significantly, Appellants do not dispute that the Plans satisfied the recommendations to provide 15 percent MPDUs and "a minimum of 25 percent of the units" as two-bedroom units. Appellants' claims center on two other Sector Plan recommendations—namely that "five percent of the units should be three-bedroom units" and that "10 percent of the units also be provided as affordable to households earning at or below 100 percent of [AMI]." At the Board Hearing, however, Maggie Gallagher testified on behalf of DHCA that the three-bedroom requirement applied to the units reserved as MPDUs and was not meant to apply to all units. Accordingly, under the existing Plans, the Sector Plan requirement could be met by simply "designat[ing] one more three[-]bedroom as an MPDU[,]" rather than adding a new unit to the proposed development. Regarding the 10 percent affordable unit recommendation, Gallagher testified that the DHCA found it "ok to waive" it on the condition that JLB Realty demonstrate the "market rate would be around that price[,]" because "the market rate units would likely be set around that price anyways[.]"

Appellants argue that the DHCA did not "have the legal authority to alter or otherwise 'waive' any recommendation of the Sector Plan[.]" However, the dispositive question is not whether the DHCA could waive the Sector Plan's recommendations, but whether the Planning Board's conclusion was "fairly debatable" and "supported by substantial evidence on the record taken as a whole." *Tochterman v. Balt. Cnty.*, 163 Md. App. 385, 409 (2005) (quoting *Mortimer v. Howard Rsch.*, 83 Md. App. 432, 441 (1990)) (emphasis removed). Here, in light of Gallagher's testimony that the market rates would likely be set around affordable unit prices, the Planning Board was entitled to find that the

51

proposed Plans substantially conformed to the Sector Plan requirement. Further, in as much as Appellants may dispute Gallagher's view, "we do not reweigh the evidence for ourselves during appellate review" so long as "the evidence was 'fairly debatable.'" *Matter of HRVC Ltd. P'ship*, 266 Md. App. 391, 426 (2025) (citation omitted). Accordingly, because the record establishes that the Planning Board's finding of substantial conformance was reasonable, we affirm the approval of the Preliminary Plan and Site Plan.

### *Forest Conservation Plan and Tree Variance*

#### *Parties' Contentions*

In their final challenge to the Planning Board's Resolutions, Appellants challenge the Planning Board's approval of the Forest Conservation Plan and associated variance request. Specifically, Appellants claim that the Planning Board failed to make sufficient findings to support the variance, emphasizing that the relevant findings contained in the Staff Report were "conclusory in nature[.]" Furthermore, Appellants assert that the granting of the tree variance request violated the Forest Conservation Law because the need for the variance was largely "necessitated by JLB Realty's own actions and desires for the finished development design."

The Planning Board counters that the tree variance was supported by substantial evidence and that JLB Realty successfully demonstrated an "unwarranted hardship" in the absence of variance. In response to Appellants' assertion, the Planning Board also emphasizes that the variance request was "not based on conditions or circumstances which are the result of actions by the Applicant[,]" but rather "based on existing site conditions and the requirements to meet development standards, Sector Plan goals, . . . and County

Code requirements[.]"  The Board also maintains that Appellants' logic would effectively render variances impossible, since any development plan inherently involves an applicant's own action.

FGMC raises a threshold issue, contending that Appellants are not entitled to judicial review under Title 7, Chapter 200 of Maryland Rules because the Forest Conservation Law "provides no express authorization" for such an action.  And, citing *Bhargava v. Prince George's County Planning Board*, 265 Md. App. 172, 198 (2025), FGMC claims that a writ of administrative mandamus does not lie in this appeal because neighbors have no cognizable property right to trees on another property owner's land.[15] On the merits, FGMC echoes the Planning Board's arguments, maintaining that the record contains "substantial evidence" to support the Board's approval.  Specifically, FGMC asserts the developer and property owner "had no hand in creating the peculiar circumstances that caused the need for the variance—such as the physical constraints

---

[15] Although we agree that a writ of administrative mandamus will lie only where "any substantial right of the plaintiff may have been prejudiced," Md. Rule 7-403, administrative mandamus is not appropriate in this case because a statutory path for judicial review already exists under the Forest Conservation Law.  *See Gray v. Fenton*, 245 Md. App. 207, 212 (2020).  Specifically, the relevant Code provision states:

> **A person aggrieved by the decision of the Planning Board on the approval, denial, or modification of a forest conservation plan (including a request for a variance) may seek judicial review of the decision in the Circuit Court** under the applicable Maryland Rules of Procedure governing judicial review of administrative agency decisions.  A party aggrieved by the decision of the Circuit Court may appeal that decision to the Court of Special Appeals.

MCC § 22A-20(b) (emphasis added).

previously described, the location of the trees, and the applicable zoning and Sector Plan requirements—the unwarranted hardship is not self-created[.]"

*Relevant Law*

The General Assembly enacted the Forest Conservation Act of 1991 (the "Act") to preserve Maryland's forests "by making the identification and protection of forests and other sensitive areas an integral part of the site planning process." *Chesapeake Bay Found., Inc. v. Creg Westport I, LLC*, 481 Md. 325, 329 (2022); *see also* Md. Code (2018 Repl. Vol.), Natural Resources Article ("NR") § 5-1601, *et seq.* In relevant part, the Act outlines "standards for local jurisdictions with planning and zoning authority to enforce during development." *Chesapeake Bay Found.*, 481 Md. at 329. The Act also "establishes the minimum standards that must be included in a local forest conservation program." *Id.* at 349. Specifically, the Act requires that a "local forest conservation program . . . include[] a policy document and all applicable new and amended local ordinances relating to implementation of the regulated activities, exemptions, the review, approval and appeal processes, incentives, legal instruments for protection, enforcement program, and penalties[.]" NR § 5-1603(c)(2)(i). Thus, as the Supreme Court of Maryland observed, although the Maryland Department of Natural Resources ("DNR") is responsible for administering the Act, it is "implemented primarily by local jurisdictions having planning and zoning authority." *Chesapeake Bay Found.*, 481 Md. at 329.

Montgomery County implemented the Act by enacting the Forest Conservation Law, which is codified in Sections 22A-1 through 22A-31 of the County Code. Relevant here, Section 22A-21 provides: "[a]n applicant may request in writing a variance from

[Chapter 22A] or any regulation adopted under it if the applicant shows that enforcement would result in unwarranted hardship." MCC § 22A-21(a). The applicant for a variance must:

(1) describe the special conditions peculiar to the property or other conditions which would cause the unwarranted hardship;

(2) describe how enforcement of [Chapter 22A] will deprive the landowner of rights commonly enjoyed by others in similar areas;

(3) verify that State water quality standards will not be violated and that a measurable degradation in water quality will not occur as a result of granting the variance; and

(4) provide any other information appropriate to support the request.

MCC § 22A-21(b); *see also* NR § 5-1611(a) (providing that "the State and local authorities shall provide for the granting of variances to the requirements of this subtitle, where . . . implementation of this subtitle would result in unwarranted hardship to an applicant"). The variance "may only be granted" if it meets the "unwarranted hardship" criteria in § 22A-21(a); however, the Planning Board may not grant the variance if granting the request:

(1) will confer on the applicant a special privilege that would be denied to other applicants;

(2) is based on conditions or circumstances which result from actions by the applicant;

(3) is based on a condition relating to land or building use, either permitted or nonconforming, on a neighboring property; or

(4) will violate State water quality standards or cause measurable degradation in water quality.

MCC § 22A-21(d).

Although the Forest Conservation Law does not statutorily define "unwarranted

55

hardship," our decisional law offers guidance. For example, in *Assateague Coastal Trust, Inc. v. Schwalbach*, 448 Md. 112 (2016), the Supreme Court of Maryland examined the "unwarranted hardship" standard in the context of the Critical Area law and concluded:

> in order to establish an unwarranted hardship, the applicant has the burden of demonstrating that, without a variance, the applicant would be denied a use of the property that is both significant and reasonable. In addition, the applicant has the burden of showing that such a use cannot be accomplished elsewhere on the property without a variance.

*Id.* at 139. Notably, according to the Supreme Court, a variance applicant need not show that "he would be denied *all* reasonable and significant use of his land without the variance[,]" because such requirement would amount to "in essence, a showing of an unconstitutional taking[.]" *Id.* at 117 (emphasis in the original). Rather, the Supreme Court clarified, "a showing of 'unwarranted hardship' is . . . whether, without the variance, the applicant is denied '*a* reasonable and significant use' that cannot be accomplished somewhere else on the property." *Id.* at 138-39 (emphasis in the original). More recently, in *West Montgomery County Citizens Association v. Montgomery County Planning Board*, 248 Md. App. 314, 346-47 (2020), we extended the Supreme Court's definition of "unwarranted hardship" to the tree variance context, holding that the Planning Board properly approved a tree variance where, "without the tree variance, the [a]pplicant would not be able to develop two lots, which is a use of the [s]ubject [p]roperty that is significant and reasonable" and the applicant "could not accomplish the use elsewhere, as the other environmental constraints precluded shifting the proposed lots." *Id.* at 347.

Because the Forest Conservation Law authorizes judicial review of the Forest Conservation Plan and tree variance,[16] our standard of review remains the same as the one that we apply in our review of the Preliminary Plan and the Site Plan—"determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions[.]" *Clarksville Residents Against Mortuary Def. Fund, Inc. v. Donaldson Props.*, 453 Md. 516, 532 (2017) (citation omitted).

Applying this standard, we find substantial evidence in the record to support the Planning Board's determination that the denial of the requested variance would deprive FGMC of "a use of the [P]roperty that is both significant and reasonable." *West Montgomery Cnty. Citizens Assoc.*, 248 Md. App. at 347 (quoting *Assateague Coastal Trust, Inc.*, 448 Md. at 139). The Planning Board found that the Forest Conservation plan and its associated variance "satisfie[d] all the applicable requirements of the Forest Conservation Law," and the Board adopted the Staff Report's variance findings in their

---

[16] Appellants had standing to file their petition for judicial review from the Planning Board's Resolutions approving the site plan and preliminary plan, which approvals are conditioned, in part, on approval of the forest conservation plan. MCC §§ 50-4.2(D)(4); 59-7.3.4(E)(2). However, as Appellants have not identified "any cognizable right that they had to the trees on" the Property, they would likely have failed to show the special aggrievement required for standing to petition for judicial review of the approval of the Forest Conservation Plan separately. *Bhargava v. Prince George's Cnty. Planning Bd.*, 265 Md. App. 172, 198 (2025). In *Bhargava*, we explained that the adjacent property owners lacked a legally cognizable interest in the Prince George's County Planning Board's grant of a variance from the tree ordinance. *Id.* Notwithstanding the Appellants' failure in this case to show how they were specially aggrieved by the tree variance in this case, we determine that there was substantial evidence to support the Planning Board's Resolutions, including its approval of the underlying Forest Conservation Plan which is intertwined with the approval of the preliminary plan and the site plan.

entirety. That report identified each protected tree subject to removal, along with the tree's respective size and location, and provided an extensive list of "constraints and requirements" surrounding the Property that necessitate the removal of those trees. Such constraints included "a north-south slope, with a decrease of eight feet from the northern extent of Woodland Drive frontage to the southern extent[,]" "an existing sewer line running through the center of the Property that must be relocated before redevelopment," and "the storm drain line and stormwater management handling runoff from Georgia Avenue." The Staff Report evaluated these site-specific conditions in light of the Sector Plan, which "granted maximum flexibility for the removal and mitigation of the forest and vegetated area[,]" and concluded that the variance was necessary to "meet development standards, Sector Plan goals, . . . and County Code requirements."

The Staff Report provided sufficient basis for the Planning Board to find that, without the variance, the proposed development would not be able to meet the "development standards, Sector Plan goals, . . . and County Code requirements"— including relocation of existing sewer and storm drain lines—constituting uses of the Property that are significant and reasonable. Accordingly, we hold that substantial evidence supported the Planning Board's approval of the Forest Conservation Plan and the tree variance.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**

58